## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **CAPSTAR BANK, a Tennessee state chartered bank,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:17-cv-01221** |
| **ELIZABETH PERRY,** | ) ) | **Judge Aleta A. Trauger** |
| **Defendant,** | ) ) ) | |

| | | |
|---|---|---|
| **ELIZABETH PERRY,** | ) ) | |
| **Counter-Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **CAPSTAR BANK, a Tennessee state chartered bank, SCOTT McGUIRE, and GERIK DEGNER,** | ) ) ) ) | |
| **Counter-Defendants.** | ) ) | |

## MEMORANDUM

Before the court are the following motions: (1) defendant/counter-plaintiff Elizabeth Perry's Amended Motion for Sanctions (Doc. No. 21); (2) Perry's Motion for Issuance of Summons (Doc. No 29), requesting that "this Court . . . sign and issue summons[es] against Counter-Defendants Scott McGuire and Gerik Degner" (*id.* at 2); and (3) plaintiff/counter-defendant CapStar Bank's Motion to Dismiss and Motion to Strike (Doc. No. 38), all of which have been fully briefed.

As set forth herein, the Motion for Sanctions will be denied; the Motion for Issuance of

Summons will be denied, but without prejudice to Perry's ability to follow the proper procedure for having summonses issued; and CapStar's Motion to Dismiss and Motion to Strike will be granted in part and denied in part, but without prejudice to Perry's ability to seek to amend her pleading.

## I.     OVERVIEW

CapStar Bank ("CapStar") filed its Complaint against Perry in September 2017, alleging diversity of citizenship as the basis for this court's jurisdiction and asserting a single cause of action against Perry for breach of a Guaranty Agreement ("Guaranty") dated November 20, 2015. (Compl., Doc. No. 1.)

After being granted numerous extensions of the deadline, Perry filed her Answer and a pleading she characterizes as a "Counter-Claim" (hereafter, "Counterclaim") on January 12, 2018. (Doc. No. 22.) In her Answer, she denies, or purports to lack sufficient information to respond to, virtually every substantive fact set forth in the Complaint. For instance, she claims to lack sufficient information to answer, and therefore denies, the allegation that CapStar and she, along with a large number of entities collectively referred to as the Borrowers[1] and others, executed the November 20, 2015 Loan and Security Agreement ("Loan Agreement") attached as

---

[1] The term "Borrowers" is defined in the Complaint to include: Sure Haven, a California corporation; Solid Landings Behavioral Health, Inc., a California corporation; Rock Solid Recovery, a California corporation; Long Beach Recovery, Inc., a California corporation; Hope's Landing, a California corporation; EMS Management, Inc., a California corporation; Asana Recovery, a California corporation; Milo's Way, a California corporation; Recovery Information Services, LLC, a Delaware limited liability company; H&J Toxicology, LLC, a Delaware limited liability company; Recovery Advisors, LLC, a Delaware limited liability company; Cedar Creek Recovery, Inc., a Texas corporation; Sage Creek Toxicology, Inc., a Texas corporation; Silver Rock Recovery, a Nevada corporation; EMS Toxicology, a Nevada corporation; The Breakers Rentals @ Long Beach, a California corporation; and Mauna Loa Management, Inc., a California corporation.

Exhibit A to the Complaint (Answer ¶ 4), even though the Loan Agreement appears to have been signed by Perry as Guarantor (Doc. No. 1-2, at 56). Likewise, she expressly denies that she executed the November 20, 2015 Guaranty attached as Exhibit C (Doc. No. 1-4) to the Complaint (*See* Doc. No. 1 ¶ 9; Answer ¶ 3) or that she entered into the Conditional Release Agreement attached as Exhibit D (Doc. No. 1-5) to the Complaint (*see* Doc. No. 1 ¶ 19; Answer ¶ 3), even though what appears to be her notarized signature is reflected on both of these documents. (Doc. No. 1-4, at 5, 6; Doc. No. 1-5, at 8.)

Moreover, elsewhere in the record, she expressly concedes having entered into those agreements; she simply disputes their meaning or enforceability. In the Summary of the Case set forth in the Counterclaim, she avers that she and non-party Steve Fennelly (as "Owners") were shareholders in Solid Landings Behavioral Health, Inc. ("the Corporation"), a corporation that was "made up of several entities," including all of those identified by CapStar as "Borrowers" in the Complaint (Counterclaim ¶ 6) and identified in note 1, *supra*, most of which were facilities engaged in providing residential and non-residential rehabilitation services for persons addicted to drugs or alcohol. (*Id.* ¶ 8.) She alleges that she and Fennelly together owned a majority interest in the Corporation. (*Id.* ¶ 11.) She alleges that CapStar authorized a "revolving loan of about $7.5 million dollars" and that she and Fennelly "executed a personal guaranty of the loan" in November 2015. (*Id.* ¶ 12.) She also alleges that she entered into a conditional release agreement with CapStar in June 2017 and further claims that each condition in that agreement has been met, thus triggering CapStar's obligation to execute the mutual release agreement referenced therein. (*Id.* ¶ 27.) Attached to the Answer and Counterclaim are the same Conditional Release Agreement ("CRA") (Counterclaim Ex. A) she denies signing and the same Loan Agreement (Counterclaim Ex. C) she denies any knowledge of in her Answer. Also attached is the original

Revolving Note (Doc. No. 22, at 121) that is the subject of the Loan Agreement, the amended version of which is attached to the Complaint.

Besides asserting claims against CapStar, the Counterclaim names as "counter-defendants" two individuals who are not parties to CapStar's Complaint: Scott McGuire and Gerik Degner. McGuire is alleged to be a citizen of Tennessee and an employee of CapStar tasked with "handl[ing] communications with distressed companies that owed CapStar money." (Counterclaim ¶¶ 4, 15.) Degner is alleged to be a resident of California and a long-time acquaintance of Fennelly's, who "insinuated himself into the Corporation's business." (*Id.* ¶¶ 3, 13.) He was initially retained as a consultant, but, in April 2016, Fennelly and Perry agreed to make him President of the Corporation. (*Id.* ¶¶ 42, 14.) The plaintiff alleges generally that CapStar, McGuire, and Degner conspired to oust Fennelly and Perry from their leadership positions in the Corporation and to drive the Corporation and its affiliates into bankruptcy in order to devalue the Corporation and place themselves in a position to acquire its assets for pennies on the dollar. Based on these factual allegations, the Counterclaim asserts seven causes of action, including claims against CapStar for breach of the CRA,[2] breach of the duty of good faith and fair dealing, and specific performance, demanding execution of the mutual release of claims as contemplated by, and in accordance with, the terms of the CRA (First, Third, and Fourth Causes of Action); and claims against CapStar, McGuire, and Degner for intentional interference with business relations, fraud, negligent misrepresentation, and breach of fiduciary duty (Second, Fifth, Sixth and Seventh Causes of Action).

More specific factual allegations are incorporated below, in the context of the discussion

---

[2] The Counterclaim references the "written contract . . . attached to this Counter-Claim as Exhibit C." (Counterclaim ¶ 51.) The Loan Agreement and original, pre-amendment Revolving Note are attached as Exhibit C. It appears that Perry actually contends that CapStar has breached the CRA attached to her Counterclaim as Exhibit A.

of the motions to which they are relevant.

## II.     MOTION FOR ISSUANCE OF SUMMONSES

In this motion, Perry simply asks, "pursuant to Rule 4 of the Federal Rules of Civil Procedure and Local Rule LR 4.01," that the court sign and issue summonses for Scott McGuire and Gerik Degner. (Doc. No. 29, at 2.) CapStar responds that the motion should be denied because (1) Perry does not assert jurisdictional grounds for her claims against Degner or McGuire in her Counterclaim, as required by Rule 8 of the Federal Rules of Civil Procedure, and the court does not appear to have personal jurisdiction over Degner, who is alleged to be a resident of California; (2) Perry cannot assert "counterclaims" against Degner and McGuire, because neither is an "opposing party" in this action; and (3) Perry has not made an effort to join them or assert a third-party action against Degner or McGuire. In addition, based on Perry's general failure to follow the proper procedure, CapStar requests dismissal of the Counterclaim in its entirety pursuant to Rule 41(b) and (c).

CapStar's objections are not well taken. At the same time, however, Perry has failed on multiple levels to follow the correct procedure for bringing claims against, and effecting service upon, Degner and McGuire. First, to obtain issuance of a summons, a party has only to "present" it "to the clerk for signature and seal" "on or after filing the complaint." Fed. R. Civ. P. 4(b); *see also* L.R. 4.01(b) ("With the filing of the complaint, third-party complaint or any other pleadings that require the issuance of a summons, the filing attorney shall prepare and submit three copies of the summons, and upon approval the Clerk shall issue same in accordance with the Federal Rules of Civil Procedure."). If the summons is properly completed—that is, if it satisfies the requirements set forth in Rule 4(a)(1)—the *clerk* "must sign, seal, and issue it to the plaintiff for service on the defendant." *Id.* At no point does this process require the filing of a motion or the

intervention of a judge. On that basis alone, the court will deny the motion, but without prejudice. If Perry continues to seek to serve the Counterclaim on Degner and McGuire, she should comply with Rule 4(b) and submit the summonses to the Clerk of Court for issuance. As set forth below, however, she should also comply with Rule 14 and, to the extent applicable, Rule 19 or 20.

Rule 13 is crystal clear in its definition of a counterclaim as a claim against an "opposing party." *Accord Adam Grp., Inc. of Middle Tenn. v. Tunnell*, No. 3:13-00258, 2014 WL 2781128, at *3 (M.D. Tenn. June 19, 2014) ("Whatever flaws Rule 13 may have, it at least has the virtue of clarity. The plain meaning of 'opposing party' is a party to the lawsuit—that is, a named party who asserted a claim against the counterclaimants." (quoting *GIA-GMI, LLC v. Michener*, No. C 06-7949 SBA, 2007 WL 1655614, at *4 (N.D. Cal. June 7, 2007))). Because Degner and McGuire are not plaintiffs who have asserted a claim against Perry, they are not opposing parties under Rule 13. Thus, if Perry pursues the issuance of summonses for them and succeeds in effecting service of process of her Counterclaim against them, they would likely have a valid basis for seeking dismissal of the claims against them. *Accord GIA-GMI, LLC*, 2007 WL 1655614, at *2 (granting the Rule 12(b)(6) motion filed by a counterclaim "defendant" on the basis that the movant himself was "not an 'opposing party' for purposes of Federal Rule of Civil Procedure 13"). Degner and McGuire, however, have never been served, and CapStar has no apparent standing to assert defenses on their behalf. The court finds, therefore, that dismissal of the Counterclaim on that basis is not warranted at this juncture.

Moreover, with respect to CapStar's request for dismissal under Rule 41, CapStar has not shown that dismissal of the claims against *it* is warranted under that rule, and, again, CapStar lacks standing to seek dismissal of the claims against Degner or McGuire, who have not actually

been served or brought into the action. While Degner and McGuire might ultimately seek dismissal on similar grounds on their own behalf, Perry, meanwhile, has the option of attempting to join Degner and McGuire in this action under Rule 14, 19 or 20, as may be appropriate. The court notes that, because more than fourteen days have passed since serving her original answer, Perry must now seek the court's permission in order to bring in third-party defendants. Fed. R. Civ. P. 14(a)(1).

### III.    MOTION FOR SANCTIONS

Perry moves for sanctions under Rule 11 of the Federal Rules of Civil Procedure, seeking monetary sanctions, attorneys' fees and litigation expenses, and dismissal of CapStar's Complaint. (*See* Doc. No. 21.) In support of her Motion for Sanctions, Perry asserts that she signed the Guaranty in favor of CapStar in 2015 and that both she and CapStar signed the CRA in 2017, pursuant to which, upon satisfaction of certain conditions, CapStar was to sign a mutual release of all claims it might have against Perry, including all claims under the Guaranty. Perry asserts that "[a]ll conditions have been satisfied," but, "[i]nstead of signing the mutual release as agreed, CapStar sued [Perry] on the very guaranty [it was] supposed to release." (Doc. No. 21, at 2.) She asserts that CapStar's claims have no evidentiary or legal basis and that the case could only have been brought for the purpose of harassment.

In response, CapStar explains in some detail its version of the underlying negotiations and transactions that led to its decision to file suit, its interpretation of the underlying contracts, and the grounds for its allegations in the Complaint that the conditions required to trigger its obligation to sign the mutual release have not been satisfied. It also argues that a dispute over the interpretation of a contract does not support a Rule 11 motion and that Perry has improperly brought what amounts to a motion to dismiss or for summary judgment in the form of a motion

for sanctions. It demands that the motion be denied, that the court sanction Perry and her attorney, Leonard Herr, by awarding it the attorneys' fees and costs it incurred in responding to the motion, and that the court enter an order effectively enforcing the Guaranty.

Rule 11 provides that "sanctions may be imposed if a reasonable inquiry discloses [that a] pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (citation omitted). "[T]he central purpose of Rule 11 is to deter baseless filings in District Court and thus . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 390 (1990). The Rule "stresses the need for some pre-filing inquiry into both the facts and the law to satisfy the affirmative duty imposed." *Merritt*, 613 F.3d at 626 (citation omitted).

Rule 11 motions are measured against an "objective standard of reasonableness under the circumstances." *Id.* Courts must not "use the wisdom of hindsight," but must instead test what was reasonable to believe at the time the pleading, motion, or other paper was submitted. *Id.* (citation omitted). Thus, as the undersigned has previously recognized, the mere fact that a claim lacks legal merit does not warrant sanctions. *Accord Fulmer v. MPW Indus. Servs., Inc.*, No. 3:04-0879, 2006 WL 1722433, at *3 (M.D. Tenn. June 21, 2006) (Trauger, J.) (denying the defendant's motion for sanctions, finding that the plaintiff's claims, "while lacking in legal merit, were reasonable under the circumstances"). The district courts are accorded "considerable deference" in ruling on a motion for Rule 11 sanctions. *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003). This court has construed Sixth Circuit precedent as requiring a showing that, in order for a party's conduct to be considered so "unreasonable" as to warrant sanctions, that conduct

must be "relatively egregious." *Fulmer*, 2006 WL 1722433, at \*5.

In this case, it is apparent to the court that the Motion for Sanctions is, as CapStar argues, effectively a dispositive motion framed as one for sanctions. The court declines, in the context of this motion, to delve too deeply into the merits of either party's position, but a cursory examination of the documents attached to both parties' filings establishes that CapStar's position is, at a minimum, "fairly debatable." *See* Fed. R. Civ. P. 11 advisory committee's note for 1993 amendments to subdivisions (b) and (c) (noting that a Rule 11 motion for sanctions "should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes. Nor should Rule 11 motions be prepared to emphasize the merits of a party's position, to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, [or] to increase the costs of litigation . . . ."). Even if the basic terms of the underlying written contracts are not subject to dispute, the ultimate resolution of CapStar's claims will require a legal analysis of those terms. In short, regardless of which party ultimately prevails, CapStar's decision to file suit to recover on the Guaranty is not sanctionable. Moreover, although the court can envision some circumstances under which it might be appropriate to file a motion for sanctions in a breach of contract action, those circumstances are not presented here. A motion for summary judgment or other dispositive motion would have been more appropriate and a better use of party and court resources.

The Motion for Sanctions (Doc. No. 21) will be denied. However, the court finds that Perry's motion, although ill-advised, was not patently frivolous, as would be required to support the imposition of sanctions against Perry and her counsel pursuant to Rule 11. CapStar's request for attorneys' fees incurred in connection with responding to the motion will, therefore, also be

denied.

## IV.     MOTION TO DISMISS AND MOTION TO STRIKE

CapStar moves under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss five of the seven claims asserted against it and Scott McGuire in the Counterclaim, specifically the claims for intentional interference with business relations, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, and breach of fiduciary duty—that is, all claims except those for breach of contract and specific performance (Counts 1 and 3), which are asserted against CapStar only.

CapStar also moves under Rule 12(f) to strike Perry's jury demand and all affirmative defenses, on the basis that Perry waived her rights to a jury trial and to raise these defenses when she executed the CRA on June 1, 2017.

### A.     Standard of Review

#### 1.     Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"; instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. *Rule 12(f)*

Under Rule 12(f), a court may, on its own or upon a timely motion, "strike from a pleading an insufficient defense." "A motion to strike is a drastic remedy that should be used sparingly and only when the purposes of justice require." *Driving Sch. Assoc. of Ohio v. Shipley*, No. 1:92-CV-00083, 2006 WL 2667017, at *1 (N.D. Ohio 2006) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)). Generally, "a motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown*, 201 F.2d at 822.

A motion to strike an affirmative defense under Rule 12(f) "is proper if the defense is insufficient; that is, if 'as a matter of law, the defense cannot succeed under any circumstances.'" *U.S.S.E.C.* v. Thorn, No. 2:01-CV-290, 2002 WL 31412440, *2 (S.D. Ohio 2002) (quoting *Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1083 (W.D. Mich. 1997)). A motion to strike should not be granted "if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits." *United States v. Pretty Prods. Inc.*, 780 F. Supp. 1488, 1498 (S.D. Ohio 1991). The court "may only strike those defenses 'so legally insufficient that it is beyond cavil that defendants could not prevail on them.'" *Id.* (citation omitted). The decision whether to strike an affirmative defense is

wholly discretionary. *See Conocophillips Co. v. Shaffer*, No. 3:05 CV 7131, 2005 WL 2280393, at *2 (N.D. Ohio 2005) ("Rule 12(f) permits the Court to act with discretion in that it may strike irrelevant and superfluous defenses or let them stand. There is absolutely no harm in letting them remain in the pleadings if, as the Plaintiff contends, they are inapplicable.")

### B.     Factual Allegations in Counterclaim

The relevant pleading for purposes of CapStar's Motion to Dismiss is the Counterclaim. There, Perry alleges, as set forth above, that she and Steve Fennelly together were majority shareholders in the Corporation made up of the Borrower entities identified in Note 1, *supra*. (Counterclaim ¶ 6.) On November 20, 2015, those entities entered into a Loan Agreement and Revolving Note for up to $5.5 million with CapStar. (Counterclaim ¶ 12 & Ex. C, Doc. No. 22, at 47–120, 121–25.) Fennelly and Perry executed a personal Guaranty of the Loan Agreement. (Counterclaim ¶ 12 & Ex. C, Doc. No. 22, at 96.) By the end of the second quarter of 2016, the loan was in default. (Counterclaim ¶ 15.) At that time, the Corporation had drawn approximately $5,000,000 of the available loan proceeds. (*Id.*)[3]

Most of the factual allegations in the Counterclaim concern the events that ensued between June 2016 and June 2017. Perry alleges that, during that time, Gerik Degner, Scott McGuire, and CapStar conspired to oust Fennelly and Perry from controlling the Corporation

---

[3] The Answer and Counterclaim, indeed, are inartfully pleaded, and the court has little patience with Perry's denial of facts in her Answer to the Complaint that she expressly admits in her Counterclaim. While it is clear that Perry may plead inconsistent legal theories, *see* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."), she does not appear to have a sound basis for denying the *existence* of the various signed contracts—or knowledge of their existence—even if she disputes their enforceability. *See Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) ("Indeed, if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document." (citation omitted)).

and to bring about its financial demise in order to reduce its value and enable them to buy it for pennies on the dollar. Specifically, Perry alleges that she and Fennelly were founders of the Corporation and were, at one point, among its executives, with Fennelly functioning as Chief Executive Officer and Perry as Chief Cultural Officer. (*Id.* ¶ 8.) The Corporation operated in several states and had, at varying times, from 70 to more than 100 employees. "It was, at all times relevant to this action, a business ready to function at a profit." (*Id.*)

The Corporation began encountering difficulties "because of the efforts of CapStar, Scott McGuire, and Gerik Degner," who "undertook a concerted effort [conspiracy] to [make] this ready-to-function-and-profit business look like a loser not worth investment or purchase so it could be bought for pennies on the dollar." (*Id.* ¶ 9.)

According to Perry, she, Fennelly, and the other shareholders were interested in either selling the Corporation or attracting investors. Gerik Degner, who worked for Alpine Pacific Capital ("Alpine"), was engaged by the Corporation as a consultant to attract investors or a purchaser. (*Id.* ¶ 11.)

In 2015, the Corporation needed "short term financing," and it entered into the Loan Agreement and Revolving Note with CapStar. Perry and Fennelly executed the Guaranty at the same time. (*Id.* ¶ 12.) Degner, at this point, began "insinuating himself into the Corporation's business." (*Id.* ¶ 13.) He proposed increasing the loan amount from CapStar and then "quickly refinanc[ing] [CapStar] out of the picture." (*Id.*) As a result of his suggestion, the revolving note from CapStar was "increased to about $11,000,000 in the first quarter of 2016." (*Id.*)

In April 2016, Degner told Fennelly and Perry that he was having trouble refinancing because potential lenders would not lend money as long as Fennelly and Perry were "in charge." (*Id.* ¶ 14.) So, again at Degner's own suggestion, Degner was made president of the Corporation.

Although his compensation package was modest, his company, Alpine, was engaged by the Corporation to provide consulting services for $400,000 per year, with Degner being the person actually functioning as the consultant. (*Id.*)

By the end of the second quarter, Degner had not refinanced the loan or succeeded in attracting a purchaser or investors, and the Corporation was in default of the Loan Agreement with CapStar. At that point, Scott McGuire, an employee of CapStar whose job was to "handle communications with distressed companies," began communicating with Degner. (*Id.* ¶ 15.)

In August 2016, CapStar demanded that Fennelly and Perry pledge their stock in the Corporation as further security for the Loan Agreement. (*Id.* ¶ 16.) Around the same time, Degner "began maximizing the Corporation's debt by continuing to borrow" under the CapStar Revolving Note and Loan Agreement, while also reducing the Corporation's income by causing it to limit or to stop accepting new patients at its treatment facilities, thus causing "precipitous financial losses." (*Id.* ¶ 17.)

In or around October 2016, a qualified buyer offered $1,000,000 to purchase one of the Corporation's facilities, but Degner refused the offer, claiming that selling the facility would reduce the Corporation's ability to generate income. The facility, however, was not operational and, therefore, was not generating income. (*Id.* ¶ 18.) Perry alleges that the Corporation "continued to pay rent for a non-operational facility, spending about $2,000,000 in an effort to preserve the asset for the sale in which Degner would buy the Corporation." (*Id.*)

By January 2017, Degner had caused the Corporation to overhire, engaging far too many employees relative to the number of patients served. In February 2017, Degner turned down another offer to purchase one of the Corporation's facilities in Texas for $7,000,000. Perry alleges that a sale in that amount would have been sufficient to pay off all or nearly all of the

CapStar debt, but "Degner and CapStar instead discussed bankruptcy and further worked toward increasing the debt owed by [the] Corporation to force that bankruptcy so that Degner and other investors, using CapStar money, could purchase the entire Corporation at a deflated price." (*Id.* ¶ 19.)

Perry claims that Degner and CapStar, through McGuire, "capitalized on their having seized control over the Corporation to avoid substantial purchases or investment in the Corporation to forward the object of their common enterprise: ensuring Degner's purchase of the [C]orporation's assets at a fraction of the cost." (*Id.*)

In March 2017, Degner and CapStar "fired" Fennelly and Perry from their respective positions. (*Id.* ¶ 20.) Perry states that, "[f]rom the time the Corporation defaulted until the end of May, 2017, [she and Fennelly] proposed several cost cutting and revenue-increasing measures including the sale of properties, the cutting of staff, and just trying to get more patients in the houses." (*Id.*) However, "Degner refused because CapStar said they did not want to do that." (*Id.*) Instead, "[o]ver the course of a year, CapStar kept [lending] money to a company that it knew was distressed." (*Id.*) According to Perry, CapStar, through Degner, was "actively preventing" Fennelly and Perry from "even trying to succeed." (*Id.*) She alleges:

> The decisions mandated by CapStar and implemented by Degner were designed to complicate if not preclude repayment of the loan CapStar is now trying to collect from Perry, personally. . . . CapStar knew it had a personal guarantee for the loan and a right to the Owners' stock. CapStar could help Degner devalue the Corporation so that it could finance the purchase of its assets at a price that would not cover the loan, [lend] money paid from the operation of the assets compiled by [Fennelly and Perry] to build the Corporation, and then still collect on the loan from the very people CapStar helped Degner swindle out of those assets.

(*Id.* ¶ 21.)

Perry alleges that CapStar "knew the Corporation's circumstances," as evidenced by Degner's repeatedly telling them that their "cost-cutting and revenue-maximizing plans were

being refused by CapStar." (*Id.* ¶ 22.) In fact, the only cost-cutting measure approved by CapStar and Degner was the cutting of Fennelly's and Perry's salaries when they were fired in March 2017. (*Id.*)

In May 2017, as the Corporation prepared to declare bankruptcy, Degner's other company, Alpine, proposed buying the Corporation's assets in a "stalking horse deal," with financing through CapStar. (*Id.* ¶ 23.) In this deal,

> Alpine would receive a turn-key operation for pennies on the dollar, made affordable by Degner's decisions to keep the now bargain-basement priced properties nearly empty for the last year. The loan sending the Corporation into Bankruptcy was not paid off because of Degner's decision to sell the properties he would soon buy, and CapStar, through McGuire, was part of the decisions made to not sell those properties. Degner and McGuire did this with money from McGuire's employer, CapStar.

(*Id.*)

Specifically with respect to CapStar, Perry alleges that the bank, acting through Degner, played an "increasing role in controlling the Corporation" beginning in October 2016. (*Id.* ¶ 24.) For instance, it directed which rent checks could be released, which legal bills could be paid and in what amount. Its approval or authorization was required for the release of funds to pay the newly hired Chief Restructuring Officer, to fund payroll, to pay taxes, to pay a marketing contract, etc. (*Id.*) In May 2017, CapStar notified Perry and Fennelly that it "would not fund anything else until bankruptcy documents were filed and an asset purchase agreement by Alpine was signed allowing for Degner to purchase the assets of the Corporation, thus forcing their hand to file [bankruptcy] and approve the asset purchase agreement [with Degner's company, the "stalking horse"]." (*Id.*) Perry alleges that the degree of control exercised by CapStar over the Corporation was "over and beyond that of an ordinary lender trying to revive or restructure a distressed company." (*Id.*)

Degner's "stalking horse bid" to purchase substantially all of the Corporation's assets for $7,000,000 was submitted in May 2017. (*Id.* ¶ 25.) On June 1, 2017, the Corporation (or several of the entities of which it was comprised) filed for bankruptcy, and Perry entered into the CRA with CapStar, pursuant to which all claims between her and CapStar, including CapStar's claims under the Guaranty, would be mutually released upon the occurrence of five enumerated conditions. (Counterclaim ¶ 27 & Ex. A, Doc. No. 22, at 28–37.) Perry alleges that all five of those conditions have been satisfied, thus triggering CapStar's duty to execute the Mutual Release attached as Exhibit A to the CRA. (Counterclaim ¶ 27 & Ex. A, Doc. No. 22, at 38.) Among these conditions were "[c]onsummation of the Bankruptcy Sale and the sale of all Assets [of the Corporation] to a Third-Party Purchaser" and entry of a final order by the bankruptcy court approving the sale. (CRA ¶ 2(a) & (b).)

However, after the Corporation filed bankruptcy and Perry entered into the CRA with CapStar, the stalking horse asset purchase agreement was never executed.[4] CapStar, "left without the cooperation of Degner, made [its] own bid for the Corporation's debt." (Counterclaim ¶ 25.) Fennelly and Perry saw their own opportunity and placed a higher bid. Degner himself also bid, but his bids were disallowed by the bankruptcy court as those of an insider. Fennelly and Perry submitted the highest bid, and they purchased the assets of their own company in the bankruptcy sale. (*Id.*) Perry complains that she is "now being sued by CapStar for the debt [she and Fennelly] could not repay because of CapStar's conduct." (*Id.*) CapStar, meanwhile, maintains

---

[4] It is apparent from the face of the CRA that the parties anticipated that the stalking horse asset purchase agreement would be consummated, but the mutual release was expressly not contingent on that outcome. (*See* CRA ¶ (G) ("All Parties realize that the APA has certain contingencies and conditions precedent, which if such contingencies and conditions precedent are not satisfied or waived, the Stalking Horse is under no obligation to purchase the Assets. All Parties further realize that . . . it is possible that the Assets may not be sold to a Third-Party Purchaser pursuant to a Bankruptcy Sale.").)

that the purchase of the Corporation's assets by Fennelly and Perry does not constitute a sale to a "Third-Party Purchaser" and, therefore, that the conditions set forth in the CRA have not been satisfied.[5] (*See generally* Doc. No. 23.)

Perry states:

Degner, McGuire, and CapStar were able to [devalue the Corporation] by material misrepresentations of the purpose for tranches of the loans, material misrepresentations about efforts to find investors and purchasers and, when they did come up, material misrepresentations about whether purchases were practicable and approvable by CapStar.

(Counterclaim ¶ 26.)

For her first Cause of Action, Perry demands that the court order CapStar to perform its obligation under the CRA by executing the mutual release it contemplates. She concedes that, "[u]pon CapStar's and Ms. Perry's signing of the release, all other causes of action against CapStar [will be] released," assuming that CapStar also drops its claims against Perry. (Counterclaim ¶ 38.) The Third Cause of Action is likewise asserted against CapStar and is for breach of contract, presumably the CRA. (Counterclaim ¶¶ 50–53.)[6] She also sues CapStar for breach of the covenant of good faith and fair dealing (*id.* ¶¶ 54–57), which goes hand-in-glove with the breach of contract claim.[7]

The Second Cause of Action is for intentional interference with business relations against

---

[5] This dispute—whether the purchase of the Corporation's assets by Perry and Fennelly qualifies as a "sale of all Assets to a Third-Party Purchaser" (CRA ¶ 2(a))—appears to be the crux of this case.

[6] As noted above, this section of the Counterclaim references only the "written contract" attached as Exhibit C, which is the Loan Agreement. Based on the reference to CapStar's failure to execute the Mutual Release, the court construes the Counterclaim to state a cause of action based on the breach of the CRA.

[7] The court finds that the claim for breach of the duty of good faith and fair dealing, asserted against CapStar only, belongs in the same class as the breach of contract claim, rather than in a class of claims that might be barred by the Release and Waiver, as discussed below.

CapStar, McGuire, and Degner. Perry appears to allege that CapStar, McGuire, and Degner interfered with her relationship with the Corporation. She asserts that the "efforts to do so were undertaken both before and after the effective date of the conditional release." (Counterclaim ¶ 46.) The Counterclaim, however, does not contain any factual allegations regarding actions taken by CapStar, McGuire, or Degner after June 1, 2017, the date Perry signed the CRA.

The Fifth, Sixth, and Seventh causes of action asserted against CapStar, McGuire, and Degner are for fraud, negligent misrepresentation, and breach of fiduciary duty, all apparently based on the various actions stated in the "Facts" section of the Counterclaim, all of which transpired prior to the execution of the CRA. (Counterclaim ¶¶ 58–71.)

## C.    Motion to Dismiss Counterclaim

CapStar argues that the CRA contains an express Release and Waiver, pursuant to which most of Perry's claims against it are subject to dismissal. The CRA's Release and Waiver provision states:

> Each Guarantor acknowledges and stipulates that he/she has no claims or cause of action of any kind whatsoever against [CapStar], its affiliates, officers, shareholders, directors, employees, agents, representatives, attorneys, consultants, successors, and/or predecessors. Each Guarantor acknowledges and stipulates that neither [CapStar], nor any of its predecessors, affiliates, officers, shareholders, directors, employees, agents, representatives, attorneys, consultants, and/or successors have engaged in any fraud, deceit, intentional misrepresentation, other unconscionable or inequitable conduct, any schemes or illicit activities, or any other conduct that would constitute "unclean hands" under applicable law. Each Guarantor hereby releases [CapStar], its affiliates, officers, shareholders, directors, employees, agents, representatives, attorneys, consultants, successors, and predecessors from any and all claims, causes of action, demands, and liabilities of any kind whatsoever, whether direct or indirect, fixed or contingent, liquidated or unliquidated, disputed or undisputed, known or unknown, which any Guarantor has or may acquire in the future relating in any way to any event, circumstance, action, or failure to act from the beginning of time to the Closing Date. Each Guarantor hereby irrevocably waives and relinquishes any and all defenses to the enforceability of the Loan Documents, and any other document(s) related thereto, including, without limitation, to the repayment of the indebtedness owed thereunder, and judgment thereon in favor of [CapStar], defenses of offset,

recoupment, and any applicable statutes of limitation. All Guarantors waive presentment for payment, protest, notice of protest, notice of nonpayment of the indebtedness owed under the Loan Documents, and/or any other obligation owed, demand, and all legal diligence in enforcing collection and hereby expressly agree that the lawful owner or holder of any indebtedness owed under the Loan Documents, including without limitation to [CapStar], may defer or postpone collection of the whole or any part thereof . . . or may release from liability on account thereof any one or more of the makers, endorsers, guarantors, and/or other parties thereto, all without notice to any Guarantor and such deferment, postponement . . . and/or release shall not in any way affect or change the obligations of any Guarantor or of any who may become liable for the payment therefore. Each Guarantor waives any claims and defenses based on principals [sic] of suretyship or impairment of collateral or of recourse.

(CRA ¶ 6.) The CRA defines the "Closing Date" as June 1, 2017. (CRA at 1.)

CapStar argues that, by executing the CRA containing the Release and Waiver provision, Perry expressly acknowledged that she had "no claims or cause of action of any kind whatsoever" against CapStar or its employees, stipulated that CapStar and its employees had not engaged in fraud or any conduct that would constitute "unclean hands," and released CapStar and its employees from "any and all claims, causes of action, demands, and liabilities of any kind whatsoever" that might have existed as of June 1, 2017. CapStar asserts that, except for the specific performance and breach of contract claims, all of the claims in the Counterclaim concern actions and inactions that occurred prior to June 1, 2017. As a result, CapStar argues, all claims asserted in the Counterclaim against it and against its employee, Scott McGuire, except those relating to the alleged breach of the CRA itself, should be dismissed with prejudice.

In response, Perry argues that, "[f]or purposes of the pleadings, the enforceability of the [CRA] is at issue." (Doc. No. 41, at 2.) She insists that, "[a]t worst," the Counterclaim is "inartfully pleaded," and she requests leave to amend to "cure any defect" and to "add new allegations of deceit in the inducement and execution" of the CRA. (*Id.*) She also claims that some of the "direct allegations of fraud in the inducement and execution" of the CRA are already

set forth in her Motion for Sanctions and the exhibits in support of that motion. (*See id.* at 2–3 ("Ms. Perry alleges that CapStar has breached [the CRA], and there are allegations of fraud, with an intention (regardless of this motion's result) of amending to add more direct allegations of fraud in the inducement and execution of the [CRA], some of which are set forth in another motion filed by Perry in this matter. Please see this Court's docket, Document numbers 21 through 21-5.").) She insists that, if the CRA "has been materially breached or is otherwise unenforceable, or affected by fraud," the validity of the waiver in the CRA may be affected. (*Id.* at 3.) In addition, she requests leave to amend the Counterclaim to allege "facts alternatively alleging fraud in the inducement to sign" the CRA and fraud in its execution. (*Id.*)

In its Reply, CapStar argues that (1) Perry alleges in the Counterclaim that she executed the Loan Agreement, Guaranty Agreement, and CRA; (2) Perry signed and submitted in support of her Motion for Sanctions a Declaration dated December 5, 2017, in which she acknowledged that the CRA was preceded by two months of negotiations and that she signed it with the expectation that, upon the sale of the assets to the [stalking horse entities], [she] would be free of debt because a mutual release would be signed" (Doc. No. 21-3 ¶ 6); (3) the Release and Waiver provision is not subject to any conditions precedent; and (4) Perry has not pleaded any facts alleging that the CRA is void, unenforceable, or otherwise invalid in any way.

The court agrees that the Counterclaim does not contain any facts suggesting that the CRA, or any part of it, is unenforceable. The first, third, and fourth causes of action seek to enforce the CRA and are premised entirely on the presumption of its validity, and the remaining causes of action do not necessarily conflict with Perry's claims seeking to enforce the CRA. In addition, Perry's Motion for Sanctions also presumes the validity of the CRA and is based on an argument that CapStar breached the CRA by refusing to sign a mutual release and filing this

lawsuit instead. Perry submitted a Declaration in support of her Motion for Sanctions in which she attests that she and CapStar spent over two months negotiating the terms of the CRA and that she was aware when she signed it that CapStar (along with Degner and McGuire) had engaged in behavior she believed was intended to force the sale of the Corporation's assets. (Doc. No. 21-3 ¶¶ 4, 5.) She states:

> I believed and still believe that CapStar actively participated with Mr. Degner in driving Solid Landings to bankruptcy with the intention of forcing a sale of its assets on the cheap. While I wanted vindication, I also wanted to be done with CapStar so that I could move on with my life with some peace of mind. To purchase that peace of mind, I agreed, after at least two months of negotiations, to allow a sale of all or substantially all the assets of the company I helped build, most likely to the man who helped drive it into the ground with CapStar's help. But ultimately, I believed being rid of CapStar was worth it.

> . . . . Degner had been undermining [the Corporation's] success for some time, later joined by CapStar employee Scott McGuire and CapStar itself. The negotiations over this conditional release agreement lasted at least two months before it was signed. I signed with the expectation that, upon sale of the assets to the stalking horse, I would be free of debt because a mutual release would be signed.

(*Id.* ¶¶ 5, 6.)

It is clear that, under Tennessee law, parties to a dispute "may agree to a release which discharges a right of action that one party has or might have against the other party." *Marlett v. Thomason*, No. M2006-00038-COA-R3CV, 2007 WL 1048950, at *5 (Tenn. Ct. App. Apr. 5, 2007) (citing *Burks v. Belz-Wilson Properties*, 958 S.W.2d 773, 776 (Tenn. Ct. App. 1997) ("[R]eleases . . . are valid in Tennessee and are not against the public policy of this state.")). A general release covers all claims in existence and within the contemplation of the parties at the time of execution. *J.D. Evans v. Tillet Bros. Constr. Co.*, 545 S.W.2d 8, 11 (Tenn. Ct. App.1976). A release is considered a contract and the rules of contract construction are applicable. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct.

App. 1991). As with any contract, in construing a release, the "cardinal rule . . . is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) (citing *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955)). Thus, the scope and extent of a release generally depends on the intent of the parties as expressed in the agreement. *Cross v. Earls*, 517 S.W.2d 751, 752 (Tenn. 1974).

The Tennessee Court of Appeals has stated:

In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that the intention of the parties shall govern, and this intention is to be determined with a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of all of the surrounding facts and circumstances under which the parties acted.

*Jackson v. Miller*, 776 S.W.2d 115, 118 (Tenn. Ct. App. 1989) (quoting 66 Am.Jur.2d Release § 30 (1973)); *see also Burks*, 958 S.W.2d at 776. Thus, in considering the effect of a release, the court should consider all of the "circumstances surrounding the execution . . . , the situation of the parties, the business to which the agreements related, . . . and the subject matter of the agreements in general." *Richland Country Club*, 832 S.W.2d at 557.

Waiver and release, however, are affirmative defenses. *See* Fed. R. Civ. P. 8(c)(1); Tenn. R. Civ. P. 8.03. Generally, a dismissal under Rule 12(b)(6) based on the positing of an affirmative defense is not appropriate, because a claimant has no obligation to plead facts to avoid an affirmative defense. *See McDaniel v. Upsher-Smith Labs., Inc.*, No. 17-5741, 2018 WL 3192933, at *8 (6th Cir. June 29, 2018) (holding that dismissal under the "learned intermediary" affirmative defense of "would be premature" and, therefore, inappropriate, because "[a] plaintiff is not required to plead around all potential defenses." (citing *Xechem, Inc. v. Bristol–Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

There are exceptions to this rule. When a plaintiff "admits all the ingredients of an impenetrable defense," a complaint that otherwise states a claim may be dismissed. *Id.* (quoting *Xechem*, 372 F.3d at 901. In addition, the Sixth Circuit has recognized, in the context of a statute of limitations defense, that, when "it is apparent from the face of the complaint that the time limit for bringing the claim[s] has passed," and a defendant seeks dismissal on that basis, the plaintiff must respond by pleading additional facts in avoidance of the statute of limitations. *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (citation omitted).

In this case, the plaintiff requests permission to amend her pleadings to allege, in the "alternative," facts showing that the CRA is unenforceable because it was fraudulently induced or otherwise. She has not, however, suggested what those facts may be. She points broadly to the documents submitted in support of her Motion for Sanctions—"Documents 21 through 21-5" (Doc. No. 41, at 3) (which consists of 359 pages)—as containing facts showing that she was fraudulently induced to enter into the CRA, but she does not specify more precisely where within those documents such facts may be found or even what facts she is referring to. Moreover, she attests under penalty of perjury in the Declaration she submitted in support of the Motion for Sanctions that, at the time she signed the CRA, she already "believed . . . that CapStar [had] actively participated with Mr. Degner in driving Solid Landings to bankruptcy with the intention of forcing a sale of its assets on the cheap." (Doc. No. 21-3 ¶ 5.) That is, even then, she had reason to believe that CapStar had engaged in the inequitable conduct that forms the basis for the claims CapStar now seeks to dismiss, thus effectively eliminating the possibility that she can now come forward with contrary facts showing that she was fraudulently induced to enter into the CRA—or that she was ignorant of the grounds for the other claims in her Counterclaim at the time she executed the CRA. As indicated above, while pleading alternative legal theories is

appropriate, Perry does not have the prerogative to plead conflicting *facts*, particularly facts that conflict with those set forth in her sworn declaration. *See* note 3, *supra*.

In other words, Perry has effectively "admit[ted] all the ingredients of an impenetrable defense," *McDaniel*, 2018 WL 3192933, at *8, thus justifying dismissal of most of her claims on the basis of the affirmative defenses of release and waiver. Specifically, she admits that she executed the CRA containing the Release and Waiver provision; she admits that the CRA was the product of two months' worth of arms-length negotiations; she admits that she was aware of the facts supporting her other claims against CapStar at the time she executed the CRA. To paraphrase *Lucent*, when it is apparent from the face of a counterclaim and documents attached to it or filed with it that the counterclaim is barred by release and waiver, and a counter-defendant seeks dismissal on that basis, the plaintiff must respond by pleading additional facts in avoidance of release and waiver. *See Bishop*, 520 F.3d at 520. Perry, although she requests permission to amend her pleading, has not identified any of the facts that she would incorporate into an amended pleading or shown how she can plead facts that would permit avoidance of the Release and Waiver provision but that do not conflict with her Declaration.

The court finds, under these circumstances, that CapStar's motion to dismiss the Second, Fifth, Sixth, and Seventh Causes of Action set forth in the Counterclaim on the basis that they are barred by the CRA's Release and Waiver provision should be granted. CapStar, however, lacks standing to seek dismissal of the claims against McGuire, who, in any event, has not yet been served, and it does not seek dismissal of any of the claims against Degner. Those claims, therefore, remain pending, even though Perry has not actually joined or served these individuals. Perry has the ability to file a motion for permission to amend her Counterclaim to avoid the application of the Release and Waiver provision, but, if she takes this route, she will be

constrained by the admissions she has already made in this case.

### D. Motion to Strike

The CRA also includes a broad mutual waiver of the right to a jury trial. (CRA ¶ 9.) CapStar moves to strike both the jury demand and the numerous affirmative defenses set forth in Perry's Answer on the grounds that they, too, are prohibited by the terms of the CRA.

The Tennessee Court of Appeals has determined that a pre-dispute contractual jury waiver is permissible under Tennessee law. *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 778 (Tenn. Ct. App. 2010). *Poole* purported not to resolve the questions of what "principles courts should apply when determining the enforceability" of a particular waiver provision or "which party bears the initial and/or ultimate burden of proof." *Id.* It nonetheless identified a non-exhaustive list of factors to apply when examining a jury-waiver provision:

> (1) the conspicuousness of the jury-waiver provision; (2) the parties' business acumen and experience; (3) the representation, or lack thereof, of counsel; (4) the negotiations had concerning the agreement and the waiver provision; (5) the relative bargaining power of the parties; (6) the nature of the contract; and (7) the existence of fraud, overreaching, or unconscionability.

Id. at 783. The parties here have not expressly briefed or addressed these issues or the question of who should bear the burden of proof. The court nonetheless finds that, regardless of who has the burden of proof, consideration of the relevant factors in light of the undisputed facts establishes that the waiver is enforceable.

First, the CRA itself is only five pages long, not including signature pages, and the jury demand is conspicuous, titled in bold-face font and spelled out in all capital letters:

> 9. **<u>Waiver of Jury Trial.</u>** THE PARTIES HEREBY WAIVE ANY AND ALL RIGHT TO A JURY TRIAL IN ANY LEGAL ACTION COMMENCED BY EITHER PARTY AGAINST ANY OTHER PARTY RELATING IN ANY WAY TO THIS CONDITIONAL RELEASE AGREEMENT, ANY EXECUTED MUTUAL RELEASE, THE LOAN DOCUMENTS, OR ANY RELATIONSHIP BETWEEN OR ANY CONDUCT BY THE PARTIES, WHETHER AT LAW

OR IN EQUITY, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

(CRA ¶ 9.) The waiver is mutual, meaning both parties waive their right to a jury trial, and its terms are unambiguous.

The factual background of this case establishes that Perry is a business woman with substantial experience. She was represented by counsel in the transaction that included the execution of the CRA and, as set forth above, Perry admits in the Declaration submitted in support of her Motion for Sanctions that the parties spent over two months negotiating the terms of the CRA. (Doc. No. 21-3 ¶¶ 4–6.) Nothing in the record suggests that the parties' bargaining power was unequal or that the jury waiver itself is unconscionable or the product of fraud or overreaching. As discussed above, Perry argues generally that the CRA itself was procured by fraud, but she has not alleged any actual facts in support of that assertion. She does not argue that the jury waiver *per se* was not knowing, voluntary, and intelligent, and her Declaration indicates that she went into the CRA with open eyes. The court will therefore grant the motion to strike the demand that a jury try any claims against CapStar that are covered by the terms of the jury waiver.

The jury waiver, of course, would not apply to any claims Perry might pursue against Gerik Degner, and CapStar does not have standing to seek enforcement of the jury waiver as it might pertain to claims against McGuire. Moreover, if Perry succeeds in raising some defense to the enforceability of the CRA generally, the court may be called upon to reconsider the enforceability of the jury waiver.

Regarding the motion to strike the affirmative defenses, as set forth above, the court may grant a motion to strike an affirmative defense under Rule 12(f) only "if 'as a matter of law, the defense cannot succeed under any circumstances.'" *U.S.S.E.C.* v. Thorn, No. 2:01-CV-290, 2002

WL 31412440, *2 (S.D. Ohio 2002) (quoting *Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1083 (W.D. Mich. 1997)). Here, CapStar has not established that each and every one of Perry's affirmative defenses is barred by the Release and Waiver provision. Thus, it is not "beyond cavil" that Perry might ultimately prevail on one or more of her affirmative defenses. Even if the defenses are wholly superfluous, "Rule 12(f) permits the Court to act with discretion" in allowing superfluous defenses to stand, because "[t]here is absolutely no harm in letting them remain in the pleadings if, as the [movant] contends, they are inapplicable." *Conocophillips Co. v. Shaffer*, No. 3:05 CV 7131, 2005 WL 2280393, at *2 (N.D. Ohio 2005). The court will deny the motion to strike the affirmative defenses.

## V.     CONCLUSION

Perry's Motion for Sanctions and Motion to Issue Summonses will be denied, and CapStar's Motion to Dismiss and Motion to Strike will be granted in part and denied in part. An Order consistent with the above analysis is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge