IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **CAPSTAR BANK**, a Tennessee state chartered bank, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 3:17-cv-01221 |
| | ) Judge Aleta A. Trauger |
| **ELIZABETH PERRY**, | )<br>) |
| Defendant, | )<br>) |

| | |
|---|---|
| **ELIZABETH PERRY**, | )<br>) |
| Counter-Plaintiff, | )<br>) |
| v. | )<br>) |
| **CAPSTAR BANK**, a Tennessee state chartered bank, **SCOTT McGUIRE**, and **GERIK DEGNER**, | )<br>)<br>)<br>) |
| Counter-Defendants. | ) |

## MEMORANDUM

Before the court is the Motion for Summary Judgment and incorporated Memorandum of Points and Authorities (Doc. No. 56) filed by defendant/counter-plaintiff Elizabeth Perry, seeking summary judgment in her favor on the sole count in plaintiff/counter-defendant CapStar Bank's Complaint (Doc. No. 1), for breach of a guaranty agreement. For the reasons set forth herein, the motion will be denied.

**I.      FACTUAL BACKGROUND**

CapStar brings suit for breach of a written contract; Perry's defense is premised upon her

interpretation of subsequent contracts executed by the parties. The existence of the various agreements and their wording are essentially undisputed. The parties simply disagree as to how to construe some provisions of the contracts.

In November 2015, Elizabeth Perry, along with Stephen Fennelly and Mark Shandrow, each personally guaranteed a loan made by CapStar to Solid Landings Behavioral Health, Inc. and other entities. (*See* Doc. No. 1-2, Loan and Security Agreement ("Loan Agreement"); Doc. No. 1-4, Perry Guaranty Agreement ("Guaranty").[1]) CapStar brings suit to enforce Perry's Guaranty, seeking to recover more than $6,000,000.

For her part, Perry maintains that CapStar is obligated to release her from the Guaranty based either on the terms of a modified Asset Purchase Agreement executed in 2017, which the parties refer to as the July 27 APA, or, alternatively, on a Conditional Release Agreement ("CRA") (Doc. No. 58-2) executed on June 1, 2017, the same day that Solid Landings and a number of related entities (hereafter, "Debtors") filed for Chapter 11 bankruptcy protection in California.

The CRA stipulates that the Debtors had entered into the November 2015 Loan Agreement and a 2016 Amended and Restated Revolving Note in the original principal amount of $9,200,000.00, prompt payment of which was guaranteed by the Guaranties executed by Perry and Shandrow ("Guarantors"). (CRA Stip. (A).) The CRA further acknowledges that, contemporaneously with the execution of the CRA, the Debtors were entering into a specific Asset Purchase Agreement ("APA" or "original APA"), dated June 1, 2017, with Alpine Behavioral Holdco, LLC, Alpine Behavioral California, LLC, Alpine Behavioral Nevada, LLC, Alpine Behavioral Texas, LLC, and Alpine Behavioral Toxicology, LLC (collectively, the

---

[1] The Guaranties signed separately by Shandrow and Fennelly are not in the record.

"Stalking Horse").

The Stipulations contained in the CRA provide in part that:

>(E) The Filing Debtors have determined it is in each of their respective best interests to sell certain assets, as more specifically set forth in the APA ("Assets"), pursuant to 11 U.S.C. § 363 ("Bankruptcy Sale") via public auction, and pursuant to the APA, Stalking Horse has agreed to act as a stalking horse bidder for the sale. Creditor [CapStar] supports the Bankruptcy Sale.
>
>(F) Due to the filing of the Bankruptcy Cases and the execution of the APA, Guarantors have requested that their guarantees of the Note be released under certain conditions.
>
>(G) All parties realize that the APA has certain contingencies and conditions precedent, which if such contingencies and conditions precedent are not satisfied or waived, the Stalking Horse is under no obligation to purchase the Assets. All Parties further realize that Creditor has a right to credit bid the Indebtedness owed by Borrowers under the Loan Documents, and that it is possible that the Assets may not be sold to a Third-Party Purchaser pursuant to a Bankruptcy Sale.

(CRA Stips. (E)–(G).)

The CRA required CapStar to execute a Mutual Release substantially in the form of the blank Mutual Release attached as Exhibit A to the CRA, upon the satisfaction of five specific conditions ("Release Conditions"), including:

>(a) Consummation of the Bankruptcy Sale and the sale of all Assets to a Third-Party Purchaser. As used herein, a "Third-Party Purchaser" means any individual or entity, including Purchasers, that buys through the Bankruptcy Sale all of the Assets. Third-Party Purchaser shall not include Creditor; and
>
>(b) The entry of a final, unappealable order by the Bankruptcy Court approving the Bankruptcy Sale and the sale of all Assets to a Third-Party Purchaser ("Final Order"); and
>
>(c) The expiration of all appeal periods related to the Final Order; and
>
>(d) The satisfaction of all conditions of closing and the closing of the Bankruptcy Sale to a Third-Party Purchaser ("Closing"); and
>
>(e) All cash money required to be paid at Closing is indefeasibly paid in full and received in full by Creditor.

(CRA ¶ 2(a)–(e).)

The original APA contemplated a bid by the Stalking Horse valued at $9,050,000.00 for substantially all of the assets of the filing Debtors. (*See* Doc. No. 58-3, APA, §§ 2.01 ("Transferred Assets"), 4.01 ("Consideration"), and Exhibit B ("Bidding Procedures") ("The Debtors have computed the total value of the Stalking Horse Proposal to be $9,050,000.").)

Ultimately, however, it became apparent that the Stalking Horse would not bid on the Debtors' assets and that the transaction contemplated by the original APA would not close. The Debtors, along with CapStar, Perry, Fennelly, and Shandrow, later filed a Stipulation ("Bankruptcy Stipulation") (Doc. No. 58-1) describing the course of events and charting the path forward:

> L. On July 11, 2017, the Debtors and CapStar received written notice from the Stalking Horse Bidder that the financing contingency set forth in Section 13.06 of the APA was not satisfied and was not being waived by the Stalking Horse Bidder, and that the Stalking Horse Bidder was not obligated to purchase the Transferred Assets and to close the sale transaction contemplated by the APA until such financing contingency was expressly satisfied or waived. Based upon the foregoing notice from the Buyer[2] and subsequent discussions among the parties, it became increasingly clear that the Stalking Horse Bidder was not able and/or willing to proceed with the purchase of the Transferred Assets upon the terms originally set forth in the APA and described in the Sale Motion.
>
> M. Having received no written overbids for the Transferred Assets by the Bid Deadline, and recognizing that the opportunity to maximize the value of the assets of the Debtors' estates by consummating a sale of the Transferred Assets to the Stalking Horse Bidder was quickly diminishing (and would potentially be eliminated upon the termination of the Debtors' post-petition financing arrangement with CapStar), the Debtors, the Committee, CapStar, and the Stalking Horse Bidder engaged in further discussions in an effort to negotiate modified terms upon which the Transferred Assets could be sold to the Stalking Horse Bidder with the consent of all parties (including the Committee).
>
> N. While the Debtors, the Committee, CapStar and the Stalking Horse Bidder were in the process of negotiating the modified terms upon which the Transferred Assets could be sold to the Stalking Horse Bidder with the consent of all parties, the Debtors, the Committee, and CapStar received a written overbid proposal from the Buyers [defined in the preamble as [Stephen Fennelly,

---

[2] This reference to "Buyer" appears to refer to the Stalking Horse Bidder.

Elizabeth Perry, and Mark Shandrow], who are the shareholders, directors, and current or former officers of the Debtors.

O. Following extensive discussions with both the Stalking Horse Bidder and the Buyers, the Debtors, the Committee, and CapStar have ultimately reached an agreement with the Buyers regarding the modified terms upon which the Transferred Assets will be sold to the Buyers (subject to documentation acceptable to the parties hereto and the approval of the Court), which modified terms are set forth in this Stipulation.

(Doc. No. 58-1, Bankruptcy Stipulation "Recitals" at 3–5.)

Based on these Recitals, which were also incorporated into the Stipulation itself (*id.* at 6), CapStar and Perry, among the other parties thereto, stipulated (among other measures) that: (1) the Buyers' overbid proposal would be deemed a "Qualified Bid" under the Bidding Procedures, and the Buyers would be permitted to participate in the Auction, assuming the parties were able to enter into a "modified form of the APA ('Modified APA') . . . acceptable to the parties hereto" (*id.*); (2) the Purchase Price would be significantly modified and reduced as set forth in the Stipulation; and (3) Mark Shandrow would pay consideration in the amount of $200,000 to CapStar upon Closing of the sale of Transferred Assets in exchange for a comprehensive release by CapStar of all claims it might have against Shandrow "from the beginning of time, and related to or arising out of . . . the Guaranty Agreement executed by Shandrow in favor of CapStar dated November 20, 2015" (*id.* at 13).

After a hearing on July 28, 2017, the Bankruptcy Court entered an order approving the Stipulations. (*See* Doc. No. 56-2, at 299.) The Debtors, CapStar, and Buyers, including Perry, eventually entered into a modified Asset Purchase Agreement (the July 27 APA)[3] consistent with the description of it contained in the Bankruptcy Stipulation. (Doc. No. 58-5.)

The only references to the Mutual Release in the July 27 APA are contained in Sections

---

[3] The July 27 APA was not actually executed on that day, but the parties nonetheless refer to it thus.

4.09, and .10 thereof, which state:

> **Section 4.09.** <u>Items to be Delivered by Lender to the Equityholders [Buyers] at the Closing</u>. At the Closing, Lender shall execute and deliver or cause to be delivered to the Equityholders the Mutual Release, duly executed by Lender if such a release has been agreed to by the Equityholder(s) and the Lender.
>
> **Section 4.10.** <u>Items to be Delivered by the Equityholders to Lender at the Closing</u>. At the Closing, the Equityholders shall execute and deliver or cause to be delivered to Lender the Mutual Release, duly executed by each Equityholder if such a release has been agreed to by the Equityholder and the Lender.

(July 27 APA, Doc. No. 58-5, at 13.)

The final clause of each of these sections ("if such a release has been agreed to by the Equityholder(s) and the Lender") was added in redline form by Perry's counsel prior to the execution of the July 27 APA and after the parties had signed the CRA. (*See* July 28–29, 2017 emails from Nathan Fransen to counsel for other parties, referencing the revision and attaching a redlined draft version of the July 27 APA, Doc. No. 58-6.) As noted in Fransen's email, only Shandrow and CapStar had reached an agreement to execute the Mutual Release. (*Id.*; *see also* Bankruptcy Stipulation ¶ 13(d).) Unlike CapStar and Shandrow, CapStar and Perry never reached a separate agreement to enter into the Mutual Release in connection with the July 27 APA.[4] Perry does not maintain that she appeared at the closing on the July 27 APA with a signed release in hand or that she expected to receive one in return from CapStar.

CapStar received its portion of the Purchase Price as defined in the July 27 APA.

The July 27 APA provides that the rights of the parties under that agreement are to be construed and enforced in accordance with California law. (Doc. No. 58-5, at 29 ¶ 17.09.)

---

[4] Perry responds to this additional factual statement by CapStar by stating that "[n]o evidence has been offered that establishes a lack of an agreement between CapStar and Ms. Perry regarding a Mutual Release." (Doc. No. 59-1, at 17.) However, she does not actually dispute the non-existence of such a side agreement, nor does she offer affirmative evidence that such an agreement exists. Instead, she argues, as a legal matter, that "the CRA and the July 27 APA appear to provide for just such a release." (*Id.*)

## II. PROCEDURAL BACKGROUND

CapStar filed its Complaint, asserting breach of the Guaranty Agreement, on September 1, 2017. Perry filed her Answer and Counterclaim for damages in January 2018. As relevant here, the Counterclaim seeks specific performance of the CRA, by requiring CapStar to execute the Mutual Release attached thereto, damages for breach of the November 2015 Loan Agreement, and breach of the duty of good faith and fair dealing. (Doc. No. 22.)

Although this appears to be a relatively straightforward breach-of-contract case, the litigation has been protracted by unnecessary delays and groundless motions. An Amended Initial Case Management Order (Doc. No. 54) was entered on August 3, 2018, after numerous continuances. The dispositive motion deadline is September 30, 2019.

Perry, in her capacity as defendant, filed her Motion for Summary Judgment on CapStar's single claim for breach of contract in October 2018, supported by a Memorandum of Points and Authorities and Statement of Undisputed Material Facts, to which was attached an undifferentiated mass of 400 pages of exhibits. (Doc. Nos. 56, 56-1, 56-2.) CapStar filed responses to the motion and the statement of facts, along with a Statement of Additional Undisputed Material Facts[5] and its own set of exhibits. (Doc. Nos. 57, 58 and attached exhibits, 58-1 through 58-6.) Perry filed a Reply brief, Reply to CapStar's Response to her factual

---

[5] This court's Local Rules anticipate that the party opposing summary judgment may file a statement of separate facts as to which it believes a material factual dispute exists. *See* Local Rule 56.01(c)(3) ("In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried."). Here, it appears that there are no true factual disputes, but simply a dispute as to how the various documents should be read in conjunction with each other.

statements, and a Response to CapStar's statement of additional facts. (Doc. Nos. 59, 59-1.)[6]

## III. STANDARD OF REVIEW

Rule 56 requires the court to grant a motion for summary judgment, if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that, as a matter of undisputed material fact, the plaintiff cannot establish at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most

---

[6] Perry also filed a separate document titled "Objections to CapStar Bank's Evidence" (Doc. No. 59-2), in which she purports to object to certain evidence relied upon by CapStar on the basis that it is irrelevant and therefore inadmissible under Rules 401 and 402 of the Federal Rules of Civil Procedure. The evidence to which she thus objects includes (1) CapStar's Exhibit 6 (Doc. No. 58-6), consisting of emails from Perry's attorney in the underlying transactions, Nathan Fransen, dated July 28 and 29, 2017, because they "do not purport to reduce Elizabeth Perry's rights to a Mutual Release" (Doc. No. 59-2, at 1–2); (2) Paragraph 13(d) of the Bankruptcy Stipulation, on the grounds that the cited paragraph "says nothing about the Mutual Release from the CRA" (*id.* at 2); and (3) Paragraphs 4.09 and 4.10 of the July 27 APA, on the grounds that the referenced "sections' release refers to the Mutual Release that Elizabeth Perry and CapStar agreed to back on June 1 in the CRA" but "say[] nothing about the mutual release in the Bankruptcy Stipulation" (*id.*).

Ironically, Perry herself introduces into evidence and relies upon the Bankruptcy Stipulation and the July 27 APA. (*See* Doc. No. 56-2.) Relevance, moreover, is clearly in the eye of the beholder. Perry does not argue that CapStar's factual statements are not supported by citations to the record, *see* Fed. R. Civ. P. 56(c)(1)(A), that the information contained within the cited documents is incorrect or subject to dispute as a factual matter, *see* Fed. R. Civ. P. 56(c)(1)(B), or that that the documents cannot be presented in a form that would be admissible in evidence, Fed. R. Civ. P. 56(c)(2). In short, Perry's "objections" amount to nothing more than argument in support of her interpretation of the various agreements. The court does not construe the Objections as a motion requiring a ruling.

favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## IV. ANALYSIS

In her motion, Perry argues that (1) the July 27 APA requires CapStar to sign a Mutual Release releasing her from her Guaranty; and (2) alternatively, that each of the criteria for release set forth in the CRA has been met, requiring CapStar to execute the Mutual Release. CapStar's position is that Perry and CapStar never reached an agreement to enter into the Mutual Release under the July 27 APA and that the requirements for a release enumerated in the CRA have not been met.

### A. The July 27 APA

As set forth above, the July 27 APA states, "[a]t the Closing, Lender shall execute and deliver or cause to be delivered to the Equityholders the Mutual Release, duly executed by Lender if such a release has been agreed to by the Equityholder(s) and the Lender." (July 27 APA§ 4.09, Doc. No. 58-5, at 13.) A parallel provision requires the "Equityholders" to "execute and deliver or cause to be delivered to Lender the Mutual Release, duly executed by each Equityholder if such a release has been agreed to by the Equityholder and the Lender." (*Id.* §

4.10.)

The term "Equityholder" is defined in the agreement to include Perry. (*Id.* at Preamble.) The term "Mutual Release" is defined as "the mutual release contemplated by that certain Conditional Release Agreement . . . by and between Lender and the applicable Equityholders." (*Id.* Exhibit A, Doc. No. 58-5, at 42.) "Equityholders" is modified in that definition by the term "applicable," because only Shandrow and Perry, and not Stephen Fennelly, executed the CRA, while all three are defined as Equityholders in the July 27 APA.

As stated in the Bankruptcy Stipulation entered into by all the parties and approved by the Bankruptcy Court, Mark Shandrow and CapStar did enter into a separate agreement pursuant to which Shandrow agreed to pay consideration in the amount of $200,000 to CapStar upon Closing of the sale of Transferred Assets, in exchange for a comprehensive release by CapStar of all claims it might have against Shandrow under the November 2015 Guaranty Agreement he executed in favor of CapStar. (Bankruptcy Stipulation ¶ 13(d), Doc. No. 58-1, at 13.)

On July 29, 2017, Perry's attorney at the time, Nathan Fransen, in recognition of the fact that Perry had not entered into such a separate agreement with CapStar, proposed a modification to a draft version of what would become the July 27 APA, to make it clear that § 4.09 of that agreement only pertained to Shandrow:

> I modified a reference to a Mutual Release between Capstar and Equityholders reflecting that it is only applicable if there is an agreement between the parties (specifically in this case for Mark Shandrow and Capstar).

(July 29, 2017 Email from Fransen to other attorneys, Doc. No. 58-6.) The language he proposed to add, "if such a release has been agreed to by the Equityholder(s) and the Lender," was incorporated into the final version of the July 27 APA. (Compare *id.* with July 27 APA § 4.09.)

In her motion, Perry argues that the July 27 APA required CapStar to execute the Mutual

Release that had been contemplated by the CRA. She suggests that the reference to "applicable Equityholders" in the definition of the term "Mutual Release" makes sense in light of the fact that Fennelly was not a party to the CRA. She suggests that the mere fact that she and CapStar were parties to the CRA meant that they had already agreed to the Mutual Release. She makes no attempt to explain the fact that Shandrow had separately negotiated and entered into a separate agreement. She insists that, "[u]nder the terms of the July 27 APA, the Mutual Release should either be signed and delivered by Capstar to Ms. Perry or otherwise be given effect. Either way, Ms. Perry is supposed to be released; summary [j]udgment should issue." (Doc. No. 56, at 9.)[7]

CapStar, for its part, points to the fact that CapStar and Perry never reached an agreement to enter into a Mutual Release in connection with the July 27 APA, as memorialized in ¶ 13(d) of the Bankruptcy Stipulation, and that Perry's own counsel added the language incorporating that requirement into the July 27 APA after the parties had signed the CRA but before they had finalized and signed the July 27 APA.

The July 27 APA, by its terms, is to be construed under California law. "Under California law, the interpretation of a written contract is a matter of law for the court even though questions of fact are involved." *Pemberton v. Nationstar Mortgage LLC*, 331 F. Supp. 3d 1018, 1035 (S.D. Cal. 2018) (quoting S*outhland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986)). Where the parties have reduced their contract to writing, the parties' mutual intent at the time of the contract is determined from the writing alone if possible. *Id.* (citing *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 513 (Cal. Ct. App. 2003)); *see also Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635,

---

[7] She adds that "Ms. Perry's claims would also go away because it was a Mutual Release." (Doc. No. 56, at 9.)

660 (Cal. Ct. App. 2007), as modified (Nov. 15, 2007), as modified (Nov. 28, 2007) ("Under contract law, the relationship between the [parties] is to be interpreted to protect the reasonable expectations of the parties at the time the contract is formed. Such intent is to be inferred, if possible, solely from the written provisions of the contract." (internal quotation marks and citations omitted)).

California statutes require that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. California law directs the courts to interpret the words of a contract in their ordinary and popular sense, unless the contract uses words in a technical manner or defines certain terms. *Pemberton*, 331 F. Supp.3d at 1035 (citation omitted).

A contract is ambiguous if it is capable of more than one reasonable interpretation. "[I]t is the court's task to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties. . . . [The ambiguous language] must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." *Kashmiri*, 67 Cal. Rptr. 3d at 660 (internal quotation marks and citation omitted).

In this case, the court finds that the July 27 APA is not ambiguous. Interpretation of the contract—specifically § 4.09, read in the context of the contract as a whole and particularly in light of the definitions of the various terms—does not require resort to anything other than the contractual language itself. CapStar, as Lender, incurred an obligation to execute and deliver a duly executed Mutual Release, in substantially the same form as that contemplated by the CRA, only "if such a release ha[d] been agreed to" by Perry and CapStar. The record is clear that they had not agreed upon any such release, so CapStar was not obligated to sign and deliver it.

If there were any ambiguity, the parties' conduct establishes their understanding that § 4.09 did not apply to Perry, because Perry and CapStar had not reached a separate agreement regarding the execution of a mutual release. Specifically, Paragraph 13(d) of the Bankruptcy Stipulation spells out, in great detail, that CapStar and Mark Shandrow had reached an agreement to execute mutual releases arising out of the entirety of their relationship but specifically including the November 2015 Guaranty Agreement executed by Shandrow in favor of CapStar. The Bankruptcy Stipulation details other release agreements—releases of the Buyers by the Debtors and the Debtors' bankruptcy estates ("Estates"), of CapStar by the Debtors and the Estates, and of the Joint Committee of Creditors by CapStar and the Buyers. (Bankruptcy Stip. ¶ 13(a)–(c), Doc. No. 58-1.) It contains no reference to a release between Perry and CapStar, as apparently recognized by her attorney in the July 29, 2017 email to the attorneys for the other parties to the July 27 APA. (Doc. No. 58-6.)

Based on the unambiguous language of the July 27 APA, Perry is not entitled to summary judgment in her favor.

    **B.    The CRA**

The CRA specifically provides that it is to be construed under Tennessee law (CRA ¶ 12), which, as it pertains to the construction of a written contract, differs little from California law as referenced above. Under Tennessee law, too, "[t]he central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). That intent generally should be gleaned from the plain meaning of the pertinent documents. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). Unless a contract is ambiguous, its "literal meaning controls the outcome of the dispute." *Id.* A contract term is "ambiguous only

when it is of uncertain meaning and may fairly be understood in more ways than one." *Id.*

Further, however, under both Tennessee and California law, the doctrine of merger provides that "the last agreement concerning the same subject matter that has been signed by all parties supersedes all former agreements, and the last contract is the one that embodies the true agreement." *Magnolia Grp. v. Metro. Dev. & Hous. Agency of Nashville, Davidson Cty.*, 783 S.W.2d 563, 566 (Tenn. Ct. App. 1989); *see also Pedus Sec. Servs., Inc. v. Con-Way W. Exp., Inc.*, No. A092479, 2001 WL 1660036, at *3 (Cal. Ct. App. Dec. 28, 2001) ("[A] written contract containing the entire agreement of the parties supersedes all prior and contemporaneous negotiations." (quoting *Schmidt v. Macco Constr. Co.*, 119 Cal. App. 2d 717, 730 (Cal. Ct. App. 1953))). And, even if no actual merger occurs, it is also clear that "several contracts relating to the same matters are to be construed together." *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 398 P.3d 556, 566 (Cal. 2017) (citations omitted); *accord Oman Constr. Co. v. Tenn. Cent. Ry. Co.*, 370 S.W.2d 563, 570 (Tenn. 1963).

In the alternative to her argument under the July 27 APA, the plaintiff asserts that the CRA requires CapStar's execution of the Mutual Release contemplated by that agreement, because the conditions precedent to such a release, as set forth in the CRA, have all been met. In response to this argument, CapStar argues that those prerequisites have not been met, because (1) Perry is not a "Third-Party Purchaser"; and (2) Perry did not purchase the Debtors' assets through the Bankruptcy Sale transaction as defined in and contemplated by the CRA.

The court finds that Perry is not entitled to summary judgment on the basis of the CRA either. The salient question with respect to the CRA is not whether its conditions for release have been met, but whether, even if they have, the agreement was effectively superseded or modified by the Bankruptcy Stipulation and the July 27 APA, based either on merger or on a reading of

the CRA in conjunction with the subsequent agreements. The parties have not effectively briefed this issue. In light of that open question, the court finds that some ambiguity exists as to whether Perry purchased the Debtors' assets through the Bankruptcy Sale that was contemplated by and defined in the CRA and the original APA and as to whether the CRA's release provision remained operative at all.

In particular, the court observes that Bidding Procedures set forth in the original APA clearly contemplated a sale of the Debtors' assets either to the Stalking Horse or to some other purchaser making a bid "on terms that . . . are substantially the same or more favorable to the Debtors and their estates" than that made by the Stalking Horse. (*See* Doc. No. 58-3, June 1 APA Ex. B ("Bidding Procedures").) It is also clear that the terms of the sale as finally consummated under the July 27 APA were substantially less favorable, both to the Debtors and to CapStar, than the terms of the original APA. Moreover, Shandrow's agreement to pay CapStar $200,000 in exchange for a release of his obligations under his Guaranty would have been wholly superfluous if the July 27 APA were not read to supersede both the original APA and the CRA that accompanied it. In that regard, it appears that, at the time the Bankruptcy Stipulations and the July 27 APA were drafted, the parties and their attorneys all understood that CapStar had no obligation to release the "Buyers," including both Perry and Shandrow, from their individual Guaranty Agreements unless CapStar and each guarantor had negotiated the terms of a release, as CapStar and Shandrow had done.

The court finds that Perry is not entitled to summary judgment in her favor on CapStar's claim for breach of the Guaranty Agreement based on the CRA either.

## IV. CONCLUSION

For the reasons set forth herein, Perry's Motion for Summary Judgment will be denied,

and the deadlines set forth in the Amended Initial Case Management Order entered on August 3, 2018 (Doc. No. 54) remain in effect.

An appropriate Order is filed herewith.

ENTER this 23rd day of January 2019.

_____
ALETA A. TRAUGER
United States District Judge